IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| JANICE TINGEY-JEWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 09-1074-KI |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| Defendant. | ) | |

KING, J.,

Plaintiff Janice Tingey-Jewell appeals the Commissioner's decision denying her applications for disability insurance benefits and supplemental security income payments under Titles II and XVI of the Social Security Act. I have jurisdiction under 42 U.S.C. § 405(g). I AFFIRM the Commissioner's decision.

Tingey-Jewell suffered minor injuries in a motor vehicle accident on December 24, 2001. She alleged disability beginning that date due to inner ear damage, an adjustment disorder with

anxiety, post traumatic stress disorder ("PTSD"), a seizure disorder, emphysema, osteoporosis, left rotator cuff injury, fibromyalgia, and orthostatic tachycardia. Admin. R. 101, 108, 144, 162, 730-31. Tingey-Jewell alleged these conditions caused vertigo, lack of balance, dizziness, impaired concentration, diminished short term memory, limited left arm movement with shoulder pain, and vision problems. *Id.* at 101, 144, 730-31.

In March 2006, the administrative law judge ("ALJ") issued an adverse decision. *Id.* at 13-22. The parties stipulated to a remand for further proceedings, which this court ordered in August 2008. *Id.* at 698-99. The ALJ conducted a second administrative hearing in January 2009, considered the evidence in the record *de novo*, and received additional evidence. *Id.* at 825-46. In May 2009, the ALJ issued the decision that is now on appeal before the court. *Id.* at 682-93.

The ALJ applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At step two of that process, the ALJ found Tingey-Jewell had a combination of impairments that satisfied the severity requirement, including a depressive disorder, an anxiety disorder, fibromyalgia, and tachycardia. Admin. R. 687. The ALJ found Tingey-Jewell retained the residual functional capacity ("RFC") to perform light work if given the option to sit or stand at will and the option to avoid walking in the dark. *Id.* at 689. At step four, the ALJ found that the work-related activities required in Tingey-Jewell's past work were not precluded by the limitations in her RFC assessment. He concluded that Tingey-Jewell retained the capacity to perform her past work as an electronics lab technician, production operator, and circuit board assembler. *Id.* at 692.

///

///

The court reviews that decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004).

Tingey-Jewell contends the ALJ erred at step two of the disability determination process by failing to specify all of her severe impairments.  She contends the ALJ erred in assessing her RFC by improperly rejecting her testimony, the statements of the lay witness, and the opinions of treating and examining physicians.  She contends the ALJ failed to comply with the court's remand instructions.  Tingey-Jewell contends these errors led the ALJ to rely on vocational testimony elicited with assumptions that did not accurately reflect all of her functional limitations and undermined the ALJ's conclusion that she retains the ability to perform her past work.

## I.    Severe Impairments

Tingey-Jewell contends the ALJ erred at step two by failing to include her alleged disequilibrium problems, cervical spine dysfunction, and shoulder impairment among the severe impairments he identified at step two.

At step two, a claimant must meet what is called the severity requirement.  The ALJ must determine whether the claimant has any combination of impairments which significantly limits her ability to do basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant does not meet this *de minimis* severity requirement, the ALJ must find her not disabled and need not continue the disability determination process beyond step two.    20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

Here, the ALJ resolved step two in Tingey-Jewell's favor, finding her ability to work significantly limited by a combination of impairments, including a depressive disorder, an anxiety

disorder, fibromyalgia, and tachycardia. Admin. R. 688. The ALJ continued the decision-making process until reaching a determination at step four. Any error in designating specific impairments severe at step two was harmless at that juncture because the ALJ found Tingey-Jewell had satisfied the *de minimis* severity requirement. *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005)(Any error in omitting an impairment from the severe impairments identified at step two was harmless where step two was resolved in claimant's favor); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)(failure to list an impairment as severe at step two was harmless error where the ALJ considered the functional limitations posed by that impairment later in the decision).

Once a claimant has surmounted step two by meeting the severity requirement, the ALJ must take into consideration all evidence of functional limitations imposed by medically determinable impairments, including any that were not identified as severe at step two, in the remaining steps of the decision. 20 C.F.R. §§ 404.1523, 416.923. Accordingly, the ALJ was required to consider all the evidence of functional limitations from Tingey-Jewell's alleged disequilibrium problems, dysfunction in the cervical spine, and shoulder impairment in assessing her RFC.

The ALJ considered all the evidence of functional limitations resulting from vestibular dysfunction, including endolymphatic hydrops. Tingey-Jewell attributes her balance problems to inner ear damage she suffered in a motor vehicle collision in December 2001. In January 2002, Tingey-Jewell complained to Robert Grimm, M.D., of episodic vertigo and imbalance after quick movements. Dr. Grimm observed that Tingey-Jewell could stand still with her feet together and tandem walk with her eyes open, but would lose balance with her eyes closed. Admin. R. 298. Dr. Grimm ordered comprehensive vestibular testing which indicated Tingey-Jewell had moderate difficulty maintaining balance under conditions in which she was forced to rely primarily on

vestibular cues for posture control, without visual cues with which to compensate. *Id.* at 198. Tingey-Jewell consistently had positive Romberg tests, which showed she had balance problems when visual feedback was eliminated. *Id.* 200, 288, 351, 371, 457.

Dr. Grimm attributed Tingey-Jewell's disequilibrium symptoms to an inner ear concussion which produced a chronic accumulation of hydraulic pressure in the inner ear known as endolymphatic hydrops. *Id.* at 290. He prescribed an antihistimine for its diuretic properties to diminish the accumulation of fluid associated with the condition. He also prescribed valium. Tingey-Jewell reported that these measures, together with a low sodium hydrops diet helped. *Id.* at 454-55.

Richard Bryant, M.D., examined Tingey-Jewell in April 2005. Tingey-Jewell was unable to stand comfortably in a Romberg position with feet together and eyes closed and told Dr. Bryant she could not walk through a dark room. *Id.* at 491. Dr. Bryant described Tingey-Jewell's balance problems like this: "This woman is able to balance and walk almost exclusively on the basis of visible clues, i.e. she tends to fall in the dark." *Id.* at 625.

In July 2005, Tatsuro Ogisu, M.D., performed a comprehensive neurologic evaluation. He reviewed Tingey-Jewell's medical records, took her subjective history, and performed a physical examination. He observed Tingey-Jewell could get on and off the examination table, move between sitting and standing positions, and maintain all positions without difficulty. Tingey-Jewell had a steady gait and could heel, toe, and tandem walk. She could maintain her balance for over ten seconds while standing on one foot bilaterally. She had a positive Romberg test, tilting to the right when standing with feet together and eyes closed. Dr. Ogisu deferred to Dr. Grimm's diagnosis of endolymphatic hydrops, but noted that Tingey-Jewell's disequilibrium was fairly subtle and appeared

to respond to medication. Dr. Ogisu provided a medical source statement estimating she could occasionally lift, carry, push and pull about ten pounds. He noted she could lift more, but opined that this was not advisable in light of her reportedly unpredictable disequilibrium symptoms. For the same reason, he opined she should avoid hazards. *Id.* at 455-61.

The ALJ also considered the testimony from David Rullman, M.D., the medical expert who appeared at Tingey-Jewell's administrative hearing. Dr. Rullman reviewed all the medical evidence in the file. He noted Dr. Ogisu's opinion that Tingey-Jewell's functional limitations were much more moderate than her subjective complaints. *Id.* at 667. He found it noteworthy that Tinge-Jewell could balance on either foot for more than 10 seconds, if permitted to keep her eyes open. He conceded that the consistently positive Romberg test results clearly showed a vestibular abnormality, but opined that she seemed to be able to compensate for it largely with other body mechanisms, particularly visual cues unless she had her eyes closed or could not see in total darkness. He opined that the labyrinthine testing ordered by Dr. Grimm indicated mild abnormalities. *Id.* at 669.

Based on the medical evidence just summarized, the ALJ concluded that Tingey-Jewell had demonstrated only mild vestibular dysfunction that would preclude activities in solid darkness. *Id.* at 692. Although Tingey-Jewell urges the court to adopt a different interpretation of the record, the ALJ's conclusion flows logically from the medical evidence and cannot be disturbed. The agency's factual findings must be upheld if supported by inferences reasonably drawn from the record and if evidence exists to support more than one rational interpretation, the court must defer to the Commissioner's decision. *Batson*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir 1995).

The interpretation Tingey-Jewell urges depends on numerous references in the administrative record in which she reported dizziness, vertigo, and nausea in a variety of situations, including driving, lying flat, and using the stairs. The ALJ found Tingey-Jewell's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms not credible. *Id.* at 690. Tingey-Jewell challenges that determination but, as discussed more fully below, the court finds no basis to reject it. Accordingly, the cited subjective claims of dizziness and vertigo symptoms do not undermine the ALJ's conclusion that these disequilibrium symptoms are mild except in settings that make the use of visual cues impossible, such as complete darkness.

The ALJ did not find functional limitations attributable to impairments of the cervical spine or shoulder. Tingey-Jewell alleged a left rotator cuff injury in her reconsideration disability report. *Id.* at 162. She alleged pain in the neck and back in her pain questionnaire. *Id.* at 144. Nevertheless, she invited error at the administrative hearings. At the first administrative hearing, Tingey-Jewell did not identify impairments of the cervical spine or shoulder when testifying about her medical impediments to working. *Id.* at 730, 731. At the beginning of the second administrative hearing, the ALJ listed the impairments at issue in the case and asked Tingey-Jewell's attorney to identify any additional impairments she claimed. Neither the ALJ nor Tingey-Jewell's attorney identified impairments of the cervical spine or shoulder. *Id.* at 828-29.

The record as a whole does not establish ongoing functional limitations of the cervical spine. At the time of her motor vehicle accident in December 2001, Tingey-Jewell suffered a neck sprain. *Id.* at 278. Contemporaneous diagnostic imaging showed a reversal of the normal curvature of the cervical spine, but degenerative changes were mild and normal space height and alignment were maintained. *Id.* at 184. Tingey-Jewell began chiropractic treatment with Don White, D.C., and

reported slow, fairly steady improvement. *Id.* at 441, 449. Tingey-Jewell returned to work, which she tolerated until she was laid off for reasons unrelated to her medical condition. *Id.* at 690-91. When Dr. Ogisu examined her, Tingey-Jewell had full range of motion for extension and flexion of the cervical spine, normal range of motion in rotation, and somewhat diminished range of motion in lateral flexion. *Id.* at 456. Dr. Ogisu reviewed Dr. White's findings but did not note any functional limitations associated with the cervical spine. *Id.* at 457-61. In addition, although Tingey-Jewell reported on her pain questionnaire that prolonged sitting at the computer caused pain in the neck and upper back, she told one examining source that she spent several hours at the computer every day chatting on-line, emailing friends, playing on-line role playing games, and serving as the on-line administrator for several message boards. *Id.* at 472. She testified that she spent at least five to six hours a day on the computer. *Id.* at 657-58.

Similarly, the record does not support ongoing functional limitations associated with an impairment of the shoulder. At about the alleged onset of disability in 2001, Tingey-Jewell had full ranges of motion in the shoulders with slight pain. *Id.* at 362. In June 2003, Dr. Sadie Arrington found restrictions in range of motion of the left shoulder, which she attributed to bursitis. *Id.* at 279. Dr. White, Tingey-Jewell's chiropractor, noted range of motion limitations in the left shoulder during 2003, in a repeating pattern of improvement followed by re-injury. *Id.* at 360. By 2005, however, Dr. Ogisu found she had full range of motion in both shoulders an no limitations on reaching with the upper extremities. *Id.* at 457, 460.

The ALJ's conclusion that Tingey-Jewell has no ongoing functional limitations related to the medical condition of her cervical spine and shoulder flows logically from the medical evidence and the record as a whole. Under the applicable standard of review, the court must defer to such findings

of fact. *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40.  Accordingly, I find no error in the ALJ's evaluation of Tingey-Jewell's allegations of functional limitations associated with the condition of her cervical spine and left shoulder.

## II.    Medical Source Statements

Tingey-Jewell contends the ALJ failed to assess her RFC accurately because he improperly rejected the opinions of Dr. Bryant, Darien Fenn, Ph.D., Michael Daniel, Ph.D, and Dr. Ogisu.  An ALJ has a duty to explain with clear and convincing reasons why he has chosen to reject a treating or examining physician's opinion that is not contradicted by another physician. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  If the opinion is contradicted by other physicians, the ALJ must explain with specific, legitimate reasons. *Thomas*, 278 F.3d at 957.

### A.    Dr. Bryant

As noted previously, Dr. Bryant examined Tingey-Jewell in April 2005.  Her main complaints were an inability to focus clearly and, when fatigued, an inability to read print comfortably.  She also reported chronic dizziness.  Admin. R. 490.  On physical examination, Dr. Bryant found Tingey-Jewell was tender at 14 out of 18 fibromyalgia pressure points.  Appropriate tests of blood pressure and heart rate changes in a standing position demonstrated that Tingey-Jewell met the diagnostic criteria for orthostatic tachycardia.  *Id.* at 492.  Dr. Bryant saw Tingey-Jewell again in June 2005.  *Id.* at 489.

In October 2005, Dr. Bryant wrote an opinion letter indicating that Tingey-Jewell was very incapacitated with fibromyalgia, chronic fatigue, orthostatic tachycardia, and low growth hormone. *Id.* at 580.  He said Tingey-Jewell was "unable to remain in the erect position for a dependable

period of time" and noted she had clinically demonstrated "tachycardia and faintness on 15 minutes of standing in the erect position." *Id.* He opined that Tingey-Jewell was "clearly unable to work" because of this condition. *Id.*

The ALJ accepted Dr. Bryant's diagnoses. He also accepted the only finding Dr. Bryant made with respect to Tingey-Jewell's functional limitations. Relying specifically on Dr. Bryant's statement that Tingey-Jewell had difficulty standing in an erect position for a dependable period of time, the ALJ found that Tingey-Jewell required the option to sit or stand at will and he modified her RFC accordingly. *Id.* at 691.

The ALJ gave little weight to Dr. Bryant's opinion that Tingey-Jewell was unable to work. *Id.* The ALJ properly reasoned that this was a vocational opinion, and not a medical opinion within Dr. Bryant's expertise. *Id.* The statement that Tingey-Jewell was unable to work did not address medical issues such as specific functional limitations or diagnoses. It did not identify work related activities that Tingey-Jewell could not perform. Accordingly, it was a conclusion on the ultimate administrative finding in the case and a matter reserved to the Commissioner. Such conclusions cannot be given controlling weight or special significance, even though offered by a treating physician. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p 1996 WL 374183 at *2. *See Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

In May 2006, Dr. Bryant wrote a second opinion letter in which he challenged Dr. Rullman's competence as a medical expert and offered additional support for his diagnoses of fibromyalgia and orthostatic tachycardia. Admin. R. 625-26. Dr. Bryant's second letter did not include an opinion regarding specific functional limitations. Tingey-Jewell contends the ALJ erroneously failed to

address the second opinion letter.  This argument fails because the ALJ accepted Dr. Bryant's diagnostic impression and the RFC assessment did not contradict any functional limitation he identified.  Because the ALJ did not reject any part of Dr. Bryant's second letter, he was not required to provide an explanation for doing so.

### B.    Drs. Fenn, Daniel and Ogisu

Tingey-Jewell contends the ALJ erroneously failed to address statements from Drs. Fenn, Daniel, and Ogisu, regarding her limitations in concentration and memory.  With respect to concentration and memory, the ALJ gave significant weight to the findings of Kathleen Ugolini, Ph.D.  Admin. R. 691.

Dr. Ugolini administered a neuropschological evaluation in July 2005. Tingey-Jewell scored in the average to superior range on most cognitive functions, with her relative weakness being tests measuring processing speed, on which she was low average.  Dr. Ugolini opined that, despite her mild deficit in processing speed, Tingey-Jewell should have no significant difficulties understanding and carrying out instructions and maintaining attention and concentration.  *Id.* at 473.  Consistent with this opinion, the ALJ did not include functional limitations reflecting deficits in concentration and attention in Tingey-Jewell's RFC assessment.  *Id.* at 689.

Dr. Fenn evaluated Tingey-Jewell in August 2003, at the request of the attorney representing her in litigation arising from her motor vehicle accident of December 2001.  *Id.* at 248.  Dr. Fenn did not make specific findings regarding concentration and memory.  He noted only that Tingey-Jewell responded inconsistently to questions "in a manner that suggested loss of attentional focus."  *Id.* at 252-53.  Tingey-Jewell described cognitive problems that had arisen since the accident on subjective reporting inventories.  Dr. Fenn's opinion focused on whether these subjectively reported symptoms

were more consistent with PTSD or with a neurologic injury. *Id.* at 253. His opinion did not include an assessment of the validity, severity, or vocational impact of the subjectively reported symptoms. The ALJ did not reject Dr. Fenn's opinion and his RFC assessment was not inconsistent with any functional limitations identified by Dr. Fenn. Accordingly, the ALJ was not required to explain why he rejected Dr. Fenn's opinion.

Dr. Daniel performed a neuropsychological evaluation of Tingey-Jewell in October 2004. *Id.* at 589. Dr. Daniel administered a battery of neuropsychological tests designed to assess cognitive function. *Id.* at 593. Tingey-Jewell's scores were generally consistent with those obtained later by Dr. Ugolini. Tingey-Jewell achieved average to superior test scores on intelligence, visual spatial construction, language abilities, memory, and executive function. Her scores on working memory and processing speed varied depending on the task, but were predominantly within the average range. As in Dr. Ugolini's testing, Tingey-Jewell showed weakness in working memory tests measuring speed of responding. *Id.* at 594-96.

Dr. Daniel opined that Tingey-Jewell's profile of neuropsychological testing reflected average to superior performance across most cognitive areas with a pattern of low average performance on some tests measuring working memory. He opined Tingey-Jewell's mild problems with working memory and processing speed likely were secondary to psychological adjustment factors, and not to brain dysfunction associated with her motor vehicle accident. *Id.* at 597-98. Tingey-Jewell was reluctant to accept Dr. Daniel's findings, and stated she "wanted to be classified as disabled in order to receive disability payments." *Id.* at 599.

The ALJ considered Dr. Daniel's evaluation. *Id.* at 688, 690-91. He did not reject Dr. Daniel's opinion and his RFC assessment is not inconsistent with the functional limitations

identified by Dr. Daniel.  The ALJ reasonably relied on the findings of Dr. Ugolini, which were

consistent with those of Dr. Daniel, but provided a more specific assessment of Tingey-Jewell's

ability to maintain concentration and attention.  Because the ALJ did not reject Dr. Daniel's opinion,

he was not required to provide an explanation for doing so.

In July 2005, Dr. Ogisu performed the neurologic evaluation described previously.  Without

stating any basis, he noted the impression that Tingey-Jewell's "ability to concentrate does appear

to be decreased." *Id.* at 457.  Dr. Ogisu did not offer an opinion on the severity, persistence, or likely

vocational impact of her decreased ability to concentrate.  Accordingly, Dr. Ogisu's statement can

reasonably be interpreted as consistent with the findings of Dr. Ugolini that Tingey-Jewell has mild

deficits that do not impose significant difficulties understanding and carrying out instructions and

maintaining attention and concentration.  *Id.* at 473.  The ALJ did not discredit Dr. Ogisu's opinion

regarding Tingey-Jewell's ability to concentrate.  Instead, he adopted Dr. Ugolini's opinion which

is more specific, but not necessarily inconsistent with Dr. Ogisu's.  Because the ALJ did not discredit

Dr. Ogisu's opinion regarding concentration limitations, he was not required to provide an

explanation for doing so.

### III.    Credibility Determination and Lay Witness Statements

Tingey-Jewell contends the ALJ improperly rejected her statements and the statements of the

lay witness, but does not provide any reasoning to support this argument.  She fails to even identify

the statements she believes the ALJ improperly rejected.

Tingey-Jewell alleged she has been disabled since her motor vehicle accident in December

2001.  She testified that she cannot work because fibromyalgia and orthostatic tachycardia leave her

with poor balance and coordination, poor vision, and because sitting up makes her tired.  Admin. R. 654-55.

In deciding whether to accept subjective statements, an ALJ must perform two stages of analysis.  The first stage is a threshold test in which the ALJ must determine whether the claimant has produced objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  If the claimant surmounts this threshold, the ALJ must proceed to the second stage, where the ALJ may discredit the claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so.  *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Smolen*, 80 F.3d at 1283.

Here the ALJ determined that Tingey-Jewell's medical conditions could cause some of the symptoms she claimed.  Admin. R. 690.  The ALJ proceeded to the second stage and found Tingey-Jewell's statements about the intensity, persistence, and limiting effects of her symptoms not credible to the extent she asserted functional limitations in excess of the RFC assessment.  He found that Tingey-Jewell could perform only light work with the option to sit or stand at will and without the requirement to walk in the dark.  *Id.* at 689.

In determining credibility, an ALJ may consider the objective medical evidence and the claimant's treatment history, daily activities, work history, and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186 *5.  An ALJ must make findings that are "sufficiently specific

to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ considered these factors in his credibility analysis. As described previously, the objective medical evidence generally supported the diagnoses Tingey-Jewell claimed, but the functional findings were mild relative to the limitations she asserted. Admin. R. 455-61, 667, 692. Conflicts between the claimant's subjective complaints and the objective medical evidence in the record can constitute specific and substantial reasons that undermine the claimant's credibility. *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999). The lack of medical evidence as to the severity of an impairment cannot be the sole basis for discrediting subjective testimony, but is a proper factor in the credibility analysis. *Burch,* 400 F.3d at 681; *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007).

The ALJ considered Tingey-Jewell's treatment history. The ALJ noted that Dr. Daniel found her subjective cognitive complaints related to an adjustment disorder and recommended treatment with psychotherapy. Admin. R. 691. There is no record that Tingey-Jewell followed this recommendation. When a claimant makes subjective statements about disabling symptoms, but fails to comply with recommended treatments, the ALJ may reasonably draw an adverse inference as to the credibility of the subjective statements. *Tonapetyan,* 242 F.3d at 1147-48; *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).

The ALJ considered Tingey-Jewell's work history. The ALJ noted that contrary to Tingey-Jewell's claim of disability beginning in December 2001, she returned to work after recovering from her motor vehicle accident and tolerated her former work until she was laid off for reasons unrelated to her medical condition. *Id.* at 101, 111, 690. When a claimant stops working for reasons unrelated

to disability, the ALJ may draw an adverse inference as to the credibility of her disability claim. *Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001).

As described previously, the ALJ considered Tingey-Jewell's daily activities which suggested a fairly active lifestyle inconsistent with her asserted limitations. Contrary to her allegation that she cannot tolerate sitting at the computer, she reported elsewhere that she spends several hours a day doing exactly that. Admin. R. 472, 657-58.

Tingey-Jewell does not challenge these findings. She argues only that the ALJ's credibility determination is fatally flawed because he erroneously rejected the statements of the medical sources discuss above and failed to identify all of her severe impairments at step two. Because I find the ALJ properly evaluated the medical source statements and did not commit harmful error at step two, Tingey-Jewell's present argument fails, as well.

Tingey-Jewell offers only the same conclusory argument with respect to the lay witness statements, *viz.* that the ALJ's analysis of the lay witness statements is fatally flawed because the ALJ erred in identifying her severe impairments at step two and improperly rejected the medical source statements described previously. Tingey-Jewell's argument fails because I find the ALJ did not err at step two or in his evaluation of the medical source statements.

## IV.    Vocational Evidence

At step four of the disability determination process, the ALJ must determine whether the claimant's RFC precludes the work-related activities required to perform work she has done in the past. If the plaintiff fails to show that she is unable to do her past work, she is not disabled within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(e), 416.920(e). Here, the ALJ determined that Tingey-Jewell retained the RFC to perform her past work. The ALJ based this

conclusion on testimony given by the vocational expert at the first hearing, who testified that Tingey-Jewell's past work did not require the performance of tasks precluded by her RFC.  Admin. R. 692.

Tingey-Jewell contends that, by relying on testimony from the prior hearing, the ALJ failed to comply with this court's remand instruction to hold a *de novo* hearing.  The remand instructions directed the ALJ to hold a new hearing and obtain additional vocational expert testimony, if necessary.  *Id.* at 698.  In accordance with this order, the ALJ conducted a new hearing in January 2009 and received additional testimony from a vocational expert.  *Id.* at 825-46.  Accordingly, the ALJ complied with the remand instructions.

Tingey-Jewell cites no authority to support her argument that an ALJ must disregard evidence received in a prior hearing when required to hold a *de novo* hearing on remand.  The court is unaware of any such authority and finds the argument unpersuasive.

Tingey-Jewell also challenges the hypothetical questions used by the ALJ in the first hearing to elicit testimony from the vocational expert.  This challenge is premised on the errors she claims the ALJ committed in identifying her severe impairments at step two and in evaluating the medical source statements.  The court has rejected those claims of error for reasons already given.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175-76 (9th Cir. 2008).  An ALJ is not required to incorporate limitations he found unsupported by the evidence in the record.  *Batson,* 359 F.3d at 1197-98; *Osenbrock v. Apfel,* 240 F3d 1157, 1164-65 (9th Cir 2001).  Accordingly, Tingey-Jewell's challenge to the vocational expert's testimony must be rejected as well.

///

///

///

17 - OPINION AND ORDER

## CONCLUSION

For these reasons, the court **AFFIRMS** the Commissioner's decision and **DISMISSES** this matter.

IT IS SO ORDERED.

Dated this ___22nd___ day of December, 2010.


___/s/ Garr M. King_____
GARR M. KING
United States District Judge